UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE AUTOMOBILE INS. CO. OF HARTFORD,
a/s/o Sherry Demrick,

                Plaintiff,              **DECISION AND ORDER**

v.

                                        08-CV-00623(A)(M)

ELECTROLUX HOME PRODUCTS, INC.,

                Defendant.
_____

        This action was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings in accordance with 28 U.S.C. §§636(b)(1)(A), (B) and (C) [6].[1] Before me is the motion of plaintiff The Automobile Insurance Co. of Hartford (referred to by the parties as "Travelers") to preclude the testimony of Thomas J. Bajzek, the expert witness of defendant Electrolux Home Products, Inc., ("Electrolux") pursuant to Fed. R. Ev. ("Rule") 702 [52]. Oral argument was held before me on July 7, 2010 [74], and the parties thereafter submitted additional letter briefs [81-1, 81-2, 81-3, 81-4] and photographs [81-5, 81-6]. For the following reasons, the motion is granted in part and denied in part.[2]


**BACKGROUND**

        This is a products liability action in which Travelers, as subrogee, seeks recovery of damages paid to its insured-subrogor, Sherry Demrick,[3] as a result of a fire at her home on

---

    [1]      Bracketed citations refer to CM/ECF docket entries.

    [2]      Because the motion is non-dispositive, it is addressed by a Decision and Order rather than a Report and Recommendation. *See* Dreyer v. Ryder Automotive Carrier Group, Inc., 367 F. Supp.2d 413, 415 (W.D.N.Y. 2005) (Arcara, J.).

    [3]      Although her surname has now changed to Slocum, I will refer to her as Sherry Demrick.

December 24, 2006, which it alleges was caused by a defective Electrolux gas clothes dryer. Amended Complaint [17].

Ms. Demrick testified at her deposition that she purchased the dryer in 2003 ([62, Ex. B], p. 33). With the exception of occasional spots on her daughter's clothes, she had no complaints about how clothes were being dried (id., pp.102-03). She would typically wash and dry carpet runners, rugs, drapes, and towels on a weekly basis (id., pp. 28-29). She cleaned the lint screen after every load (id., p. 30). She recalls checking the exterior vent in October 2006 because she pulled it off to run electrical cords into her basement during the October snowstorm. At that time, she could see inside the vent tube and there was no lint (id., pp. 47-48). She was surprised to see the photograph showing a clogged vent cover [81-6], since she recalls checking the vent fairly regularly ([62, Ex. B], pp.71-72).

On the evening of the fire, her daughter had been drying a cotton quilt blanket with polyester filling (id., pp. 19-20). After smelling smoke, Ms. Demrick went to the basement and found the dryer in flames (id., p. 17).

In his initial report dated August 18, 2009 [52, Ex. A], Mr. Bajzek opined, *inter alia*, that "there was very heavy lint accumulation found throughout the interior of the dryer cabinet . . . [and] a discoloration on the burner tube from flame impingement due to restriction of normal air flow through the dryer" (id., p. 3), that "the opening of the exhaust hood was completely blocked with lint and feathers, severely restricting the airflow from the dryer exhaust" (id., p. 4), that there "is no evidence of any design or manufacturing defect in the subject dryer" (id., p. 6), and that "the airflow through the subject dryer was restricted . . . [which] caused an excessive accumulation of lint that ignited within the dryer" (id., p. 6).

In a supplemental report dated November 6, 2009 [52, Ex. C], he further opined that "[e]xcessive lint accumulation will not occur in a . . . properly installed and maintained dryer. This opinion is based on the mechanics of air flow through the dryer as described in my [initial] report, and the results of ongoing testing of Electrolux-manufactured dryers with proper and restricted airflow" (id., p. 1).

Mr. Bajzek admitted at his March 22, 2010 deposition that the ignition source for the dryer fire was lint, but could not specify the location of the ignition in the dryer ([63, Ex. I], p. 222). He stated that "the photographs of the subject dryer speak for themselves, in terms of the amount of lint that was there . . . . Based on my experience in inspecting many, many dryers . . . this would qualify as or be characterized as very heavy lint accumulation" (id., pp. 78-79). He identified photos showing what he characterized as very heavy lint accumulation, including photo #3 on page 3 of his report (id., pp. 79, 87), photo #90, showing a ruler extending one inch into lint at the bottom of the dryer (id., pp. 93-94), and photos showing what he described as very heavy lint accumulation adhered to the burner assembly (id., p. 96).

He based his characterization of the level of lint accumulation on his experience of having viewed approximately one thousand dryers over the past ten years (id., pp. 88-89), most of which were post-fire inspections (id., p. 98). He could not say how many of those had very heavy lint accumulation (id.). He would characterize lint accumulation as ranging from minimal to very heavy, but was unable to say how many of the thousand dryers fell into each category (id.). He stated that unless one has experience with dryers similar to his, one cannot judge whether the lint accumulation is very heavy (id., p. 89), and agreed that, depending on their own experience, someone else might consider the same lint accumulation to be moderate (id., p. 79).

He testified that he was currently engaged in a study designed to compare lint accumulation in dryers with proper airflow versus restricted airflow (id., p. 130), which would further his understanding of how lint accumulates in this type of dryer under conditions of proper and improper airflow (id., p. 160) and "provide[ ] another good data point to rely on in characterizing the extent of lint accumulation" (id., pp. 133-34). The testing used ASTM (American Society for Testing and Materials) standard laundry loads (id., p. 143). Although his test required the same laundry load to be washed each time, he admitted that average families do not dry the same load each time, and that what is contained in different loads can affect lint accumulation (id., p. 208). He did not compare what was in Ms. Demrick's typical laundry load with what he was drying under the ASTM standard (id., p. 167).

He admitted that the thread count of the clothing being dried could affect lint accumulation, but did not know the thread count of the clothing used in the testing (id., p. 168). He did not specify a temperature for the testing, and does not know whether the temperature could affect on lint accumulation (id., p. 169). The clothes washed in his tests were not soiled, whereas he admitted that most people wash only soiled clothing, and did not know whether soiling of clothes affects lint accumulation (id., p. 169). He did not measure pH or water hardness level for the testing, and did not know to what degree that could affect lint accumulation (id., p. 170). He acknowledged that the type of detergent used may affect lint accumulation, and did not know whether the detergent used in the testing was the same as that used by Ms. Demrick (id., p. 198). He did not know whether bleach will affect lint accumulation (id., pp. 198-99). When asked to list the differences between the Demrick dryer and the dryers used in his testing, he replied: "I know there are . . . differences and I would not be able to list them for you here today" (id., p. 153).

He further testified that the airflow in the Demrick dryer was restricted (id., p. 202). "I think the cause [of the restriction] may have varied over time . . . . What I can tell you is that the airflow was restricted based on the physical evidence, but exactly the manner in which the restriction was there every day . . . I don't have a way nor does anybody have a way of telling you that" (id). The "physical evidence" to which he referred was the photos showing "blockage . . . regarding the lint and feathers in the exhaust hood" (id.; *see also* photos ##25, 26 [81-5, 81-6]).

His initial report stated that "the opening of the exhaust hood was completely blocked, severely restricting the airflow from the dryer exhaust" ([52, Ex. A], p. 4). When asked what he meant by "completely blocked", he replied that "the photographs speak for themselves" ([63, Ex. I], pp. 106, 110). However, he admitted that "completely blocked means something less than 100-percent blocked" (id., p. 109), and that he was "not saying zero airflow" (id., p. 107). He could not quantify the level of airflow coming out of the exhaust hood, because the blockage had been removed by the time he saw it (id., pp. 108, 114). Therefore, he could not say what percentage of airflow restriction existed in Ms. Demrick's dryer at the time of the fire (id., pp. 208, 209).

The only specific location of the airflow restriction which he could identify was the lint and feathers at the "weather head" (id., p. 223).[4] He did not know when the blockage of that air vent occurred (id., p. 112). "We don't know when that blob of lint and feathers got there or how long it was there. What we do know, based on the physical evidence, is that there was an extended period of time over which there was an obstructed airflow, resulting in very heavy lint

---

[4] The deposition questioner called the exterior vent a "weather head", whereas Mr. Bajzek referred to it as an "exhaust hood" (id., p. 109).

accumulation and the pattern on the burner tube" (id., p. 224). "What I have evidence of is airflow restriction over a long period of time" (id., p. 112). He added that "had that obstruction been removed and there was proper airflow, the fire wouldn't have happened" (id., p. 224).

His initial report states that dryer "met the requirements of all applicable codes and standards at the time it was manufactured, including but not limited to ANSI Z 21.5.1" [52, Ex. A, p. 6]. However, he could not recall whether he had reviewed any standards other than ANSI Z 21.5.1 ([63, Ex. I], p. 123), and he did not believe it was possible for him to list all potentially applicable standards (id., pp. 127-28).

## ANALYSIS

### A. Scope of This Decision

In moving to preclude Mr. Bajzek's testimony, Travelers argues that "Bajzek has no basis for his opinion(s) which quantifies the level of lint accumulation in [the] subject dryer, or which attributes the subject fire to restricted airflow caused by 'high' [levels] of lint accumulation. Accordingly, as there is no valid basis for Bajzek's opinions in this matter, his testimony must be precluded in its entirety." Travelers' Motion [52], ¶7. However, Travelers conceded at oral argument that "some of his testimony might be allowed" ([74], p. 31). *See* Henry letter dated July 9, 2010 [81-2] (listing portions of his testimony to which it does not object).

Its challenge to his testimony assumes that "Bajzek's opinions are based *primarily* on two sources: certain Dryer Airflow Testing being conducted by Electrolux, and his 'experience' in allegedly evaluating a 'thousand' dryers". [52, ¶3, emphasis added]; Travelers' Memorandum of Law ([52-2], p. 4) (arguing that Mr. Bajzek's opinions are based "essentially"

on the testing and his experience"). However, according to his initial report, Mr. Bajzek's opinions are based not only on the dryer testing and his inspection of other dryers over the years, but also on his "education, training and . . . review of the materials, inspection and analysis as described above" ([52, Ex. A], p. 6).

His initial report indicates that he reviewed numerous documents, including depositions, fire reports, the reports of Travelers' expert (David Beauregard), and photos of the fire scene; that he inspected the Demrick dryer itself, and that he set forth an airflow analysis (id., pp. 1-6). His supplemental opinion, in which he states that "excessive lint accumulation will not occur in a . . . properly installed and maintained dryer", is based not only on "the results of ongoing testing of Electrolux-manufactured dryers", but also on "the mechanics of air flow through the dryer as described in my [initial] report' ([52, Ex. C], p. 1).

Travelers' motion does not address all of these foundations for Mr. Bajzek's opinions - instead, it argues that he may not base his opinions on the dryer testing (*see* Travelers' Memorandum of Law [52-2], pp. 5-16) or on his experience in inspecting a thousand other dryers (id., pp. 16-21). Accordingly, this opinion will directly address only those two arguments, rather than Mr. Bajzek's opinions in their entirety. The admissibility of other aspects of Mr. Bajzek's opinion (or the opinion of Travelers' expert, David Beauregard)[5] may be considered in subsequent motions, should any be filed.

While Electrolux suggests that "Travelers is not entitled to two bites at the apple; thus, no further challenges should be permitted" (Electrolux's Memorandum of Law [62], p. 2, n.

---

[5] Electrolux argues that "Travelers' own expert has offered opinions as to the quantity of lint found in the Dryer using the same or similar verbiage that Travelers complains is improper when uttered by Mr. Bajzek". Electrolux's Memorandum of Law [62], p. 12. Since Electrolux has not challenged Mr. Beauregard's testimony, I express no opinion as to its admissibility.

1), I disagree. Although motions *in limine* may be filed at any time, they are typically filed shortly before trial. *See* Loc. R. Civ. P. 16.1(f)(1)(B).

**B.    The Standard for Admissibility of Expert Testimony**

"The Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702 - it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (*quoting* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)).[6]

"In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id.

"Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered . . . . In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Id.

Applying these principles, I will address the admissibility of the specific testimony to which Travelers objects.

---

[6]    While the witness must also be qualified to testify as an expert, Travelers "does not challenge the qualifications of Bajzek to testify in this matter. Rather, [it] challenges the reliability . . . and the relevancy of his opinions". Travelers' Memorandum of Law [52-2], p. 3, n. 2.

## C. May Mr. Bajzek Testify as to Lint Accumulation Based on the Dryer Testing?

"To establish causation, [plaintiffs] must offer admissible expert testimony regarding both general causation . . . and specific causation." Amorgianos, 303 F.3d at 268. "General causation bears on whether the [condition] at issue *can be* caused or exacerbated by the defendant's product. 'Specific' causation bears on whether, in the particular instance, the [condition] actually *was* caused or exacerbated by the defendant's product." Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252, n. 1 (2d Cir. 2005) (emphasis added).

As applied to this case, the concept of general causation would be that restricted airflow *can* increase lint accumulation in a dryer, and the concept of specific causation would be that restricted airflow *did* cause the levels of lint accumulation observed in the Demrick dryer. Accordingly, the admissibility of Mr. Bajzek's testimony concerning the dryer testing must be analyzed with regard to each type of causation:

### 1. General Causation

At oral argument, Electrolux admitted that the purpose of the dryer testing was "not to replicate the conditions involved on this dryer at the time of the incident, but merely to establish . . . that there is a relationship between airflow restriction and lint accumulation" [74, p. 6]. That is the concept of *general* causation, *i.e.*, that restricted airflow can increase lint accumulation.

Travelers claims that it "does not and never has contested that point, and would stipulate to that principle . . . . thus negating the need for the introduction of the controversial

[testing]". Travelers' Reply [70], pp. 7, 2. However, Rule 401 "does not define relevancy with reference to the existence of dispute. If the point counts in the case, evidence that tends to prove it is relevant even if the point is uncontested or stipulated. The question whether to admit evidence . . . when one party has offered to stipulate to the point, is resolved by applying [Rule] 403, and not by excluding the evidence as irrelevant." 1 Mueller and Kirkpatrick, Federal Evidence (Third Ed.) §4:1 (Thomson/West 2007).

While relevant evidence may nevertheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence", I conclude that Mr. Bajzek should be allowed to testify as to general causation (that reduced air flow can cause lint accumulation), with appropriate limiting instructions as to the purpose of the testimony so as to eliminate any danger of confusion by the jury.

However, that does not necessarily mean that he may also testify as to specific causation.

### 2. Specific Causation

The fact that general causation is established (*i.e.*, that airflow restriction *can* cause lint accumulation) does not relieve Electrolux of the obligation to prove specific causation (namely that airflow restriction *did* cause lint accumulation in this case).

Not only was no attempt made in the dryer testing to replicate the conditions in the Demrick dryer, but Mr. Bajzek acknowledged that there can be several possible causes (in addition to reduced airflow) for lint accumulation in, including laundry load content, thread

count, temperature, soiling, pH or water hardness, type of detergent, and use of whether bleach ([52, Ex. I], pp. 167, 168, 169, 170, 198, 199, 208); *see also* Travelers' Memorandum of Law [52-2], p. 11.

In order for Mr. Bajzek's testimony on specific causation to be considered reliable, he must account for and rule out these other potential causes. "Methodology is reliably applied if the expert completes the required procedure, the data used is typically relied upon, *and the expert does not fail to account for relevant variables*." Johnson v. Avco Corp. 2010 WL 1329361, *2 (E.D.Mo. 2010) (emphasis added). However, Electrolux admits that the only variable which the testing accounts for is reduced airflow: "There are a number of factors that do impact upon the generation of lint. But the fact is that this testing that was done was to isolate the effect of restriction . . . . The attempt to isolate what happens when there's a restriction in airflow . . . is that which is being tested" ([74], p. 32).

Since he fails to rule out these other potential causes of lint accumulation, Mr. Bajzek's testimony concerning the dryer testing cannot be considered reliable on the question of specific causation.[7] *See* Munoz v. Orr, 200 F.3d 291, 301 (5th Cir. 2000), cert. denied, 531 U.S. 812 (2000) (excluding expert testimony where the expert "admitted to failing to consider other variables . . . as explanations", reasoning that the "failure to control for other explanatory variables makes an expert's [opinion] essentially worthless"); Amorgianos, 303 F.3d at 268 (excluding expert testimony as to plaintiff's exposure to a solvent where the expert "testified that the evaporation rate of a solvent from paint . . . depends on the volatility/vapor pressure of the

---

[7] Although Mr. Bajzek did testify concerning the dryer testing in another case [81-1], for strategic reasons Travelers did not seek to preclude that testimony. "There were particular reasons we let that go in. It was not challenged."[74, p. 22]. However, that does not prevent Travelers from challenging his testimony in this case.

particular solvent in question, temperature, humidity and radiant energy", but "did not include any of these variables in his calculations"); Wills v. Amerada Hess Corp. 379 F.3d 32, 50 (2d Cir. 2004), cert. denied, 546 U.S. 822 (2005) ("Although Dr. Bidanset conceded that cigarette smoking and alcohol consumption were major risk factors for the development of squamous cell carcinoma, he failed to account for these variables in concluding that decedent's cancer was caused by exposure to toxic chemicals such as benzene and PAHs . . . . Dr. Bidanset's failure to account for decedent's smoking habit and alcohol consumption as possible causes of decedent's squamous cell carcinoma, strongly indicated that [his] conclusions were not grounded in reliable scientific methods, as required by *Daubert*").

**D.     May Mr. Bajzek Testify as to Lint Accumulation Based on his Experience in Inspecting Other Dryers?**

When asked for the criteria by which he "judge[s] whether a dryer has very heavy accumulation [of lint] or some other amount", Mr. Bajzek referred to his "experience with having viewed probably a thousand dryers over the course of the last ten-plus years by the various manufacturers" ([63, Ex. I], pp. 88-89). However, he had little recollection of the details of those inspections. He could not say how many of those dryers had very heavy lint accumulation, and he agreed that, depending on their own experience, someone else might consider the same level of lint accumulation to be moderate rather than heavy (id., pp. 79, 89).

"If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it." Rule 702,

Advisory Committee's Note (2000 Amendments); Emig v. Electrolux Home Products, Inc., 2008 WL 4200988, *8 (S.D.N.Y. 2008). "Nothing in . . . the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

Thus, the expert "must be able to say more than that his opinion rests on his particular experiences in some line of work or endeavor. He must provide information about the nature of that experience and must show how he has brought it to bear on the matter at hand. The expert must be able to describe some method of analysis that explains the conclusion that he proposes to present, providing at least some *comparable data* that provides him with a basis for reaching the conclusion that he plans to offer." 3 Mueller and Kirkpatrick, Federal Evidence (Third Ed.) §7:10 (Thomson/West 2007) (emphasis added).

For example, in United States v. Frazier 387 F. 3d 1244, 1265 (11th Cir. 2004), cert. denied, 544 U.S. 1063 (2005), the court upheld the exclusion of expert testimony where the expert failed to adequately relate his experience to his opinion: "Since Tressel was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *See also* Dreyer, 367 F. Supp. 2d at 417 ("Proctor's conclusions regarding the absence of defect may well have been based on his education, training and experience as an engineer. However, his failure to explain why his training and experience led him to his conclusion is the reason why his opinion cannot be accepted").

Since Mr. Bajzek is unable to adequately explain how his experience in inspecting other dryers supports his conclusion as to the level of lint accumulation in the Demrick dryer, he may not base his opinion on that experience.

E.  **Is Electrolux Entitled to an Evidentiary Hearing?**

In opposing Travelers' motion to preclude, Electrolux has requested "the opportunity to present the testimony of Mr. Bajzek to supplement oral argument and further assist the Court in making its preliminary admissibility decision". Electrolux's Memorandum of Law [62], p. 6. Travelers responds that it has "no real objection to . . . testimony being offered if the Court thought it was necessary after you read the papers. If you first thought you could rule on the papers, then we could go that route, but if you thought you needed testimony we have no objection" [74, p. 25].

In view of the parties' written submissions and oral argument, I see no need for an evidentiary hearing. See Lippe v. Bairnco Corp., 288 B.R. 678, 701 (S.D.N.Y. 2003), aff'd, 99 Fed. Appx. 274 (2d Cir. 2004) ("Plaintiffs' request for an opportunity to present the testimony of [the experts] at an evidentiary hearing is denied . . . . [T]he testimony would add nothing. The parties have provided a voluminous record, which includes the experts' reports [and] complete transcripts of the experts' depositions . . . . The experts have had a full and fair opportunity to explain their opinions").

F.  **Other Aspects of Mr. Bajzek's Opinions**

Although I am not at this time deciding the admissibility of any other aspect of Mr. Bajzek's opinion, for the parties' benefit I will briefly discuss (strictly as *dicta*) my initial

reaction to other testimony which was mentioned in the parties' submissions. Should additional motions be filed, the parties may address these concerns.

1. **Compliance With Applicable Codes and Standards**

As previously discussed, Mr. Bajzek testified that the Demrick dryer "met the requirements of all applicable codes and standards at the time it was manufactured, including but not limited to ANSI Z 21.5.1" ([52, Ex. A], p. 6), but could not identify any other standards. Travelers "would concede he probably has a basis to say that it meets the ANSI standard that he cites in his report [but] would expect to challenge the foundation for his claim that the dryer meets all other standards, because he couldn't articulate them." [74, p. 4]; Travelers' Reply [70], p. 1, n. 1.

Although that issue is not currently before me, I tend to agree that Mr. Bajzek's testimony as to compliance with codes and standards should be limited to the single standard which he has identified, namely ANSI Z 21.5.1.

2. **Blockage in the Exhaust Hood**

Electrolux argues that "there is other ample evidence in the record . . . that Mr. Bajzek is relying on with respect to the restriction [of airflow] in this Demrick dryer. There is physical evidence of a clogged vent cap and there is visual evidence on inspection of the dryer itself" [74, p. 15]. However, Mr. Bajzek's characterization of the extent of the blockage in the exhaust hood (or vent cap) adds little, if anything, to what the photographs depict. When asked what he meant by "completely blocked", he replied that "the photographs speak for themselves" ([63, Ex. I], pp. 106, 110); [81-5, photo #25; 81-6, photo #26].

In light of that statement, I question whether expert testimony as to the extent of blockage should be allowed, since "[u]nder Rule 702, a conclusion that the jury could just as easily have drawn for itself based on its own knowledge or experience is subject to exclusion". United States v. Boissoneault, 926 F.2d 230, 233 (2d Cir. 1991). "Expert testimony is not admissible when it addresses matters which a jury is capable of understanding and deciding without the expert's help." Dreyer, 367 F.Supp.2d at 440 (*citing* Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 708 (2d Cir. 1989)).

Moreover, he admitted that there was *some* airflow through the vent notwithstanding the blockage, but was not able to quantify its extent or the duration of the blockage ([52, Ex. I], pp. 106-114). "We don't know when that blob of lint and feathers got there or how long it was there. What we do know, based on the physical evidence, is that there was an extended period of time over which there was an obstructed airflow, resulting in very heavy lint accumulation and the pattern on the burner tube" (id., p. 224).

While exact specificity cannot be expected under these circumstances, I question whether this type of testimony is impermissibly "speculative or conjectural". *See* Zerega Ave. Realty Corp. v. Hornbeck Offshore Transportation, LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) ("[a] trial judge should exclude expert testimony if it is speculative or conjectural").

Notwithstanding these concerns, I will keep an open mind on these issues pending further submissions by the parties, should they be so inclined.

**CONCLUSION**

For these reasons, Travelers' motion to preclude the testimony of Thomas J. Bajzek [52] is granted to the extent of precluding testimony as to the level of lint accumulation in

the Demrick dryer based upon the testing of other dryers or his experience in inspecting other dryers over the years, but is otherwise denied, without prejudice to the filing of another motion addressing other aspects of his testimony.

**SO ORDERED.**

Dated: September 15, 2010

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge